We will hear argument next in Elbit Systems Land and C4I Ltd v. Hughes Network Systems, number 181910. Mr. Lee. May it please the court, my name is Bill Lane together with my partner Lauren Fletcher. I represent Hughes. I would like to focus this morning on the infringement and damages issues, but of course would address any of the other issues the panel desires. Let me turn immediately to non-infringement and I'd like to begin by focusing on the claim limitation requiring, and I quote, a second communication means for continuous transmission of data. The district court construed this as a means plus function term having the function of, and again I quote, continuous transmission of data. The patent written description expressly contrasts this continuous transmission of data with a transmission of data in non-continuous birth. That's at column 15, lines 43 to 45. In Hughes' products, Elbit accused the stream mode of being the second communication means, but the undisputed facts agreed to by even Elbit's expert demonstrate that the stream mode does not send a continuous transmission of data. Am I remembering right that the gist of the testimony from Heather's eyes expert is that continuous and bursty are not discrete precisely defined things, and so length of a burst, if it is sufficient, is viewed within the art as continuous, and so the long bursts that are part of your second mode would be viewed as continuous? Your Honor, these answers to that question. First, that is the argument that's made to you in the briefs. The argument that the Elbit expert provided was much more conclusory. It was simply that if you look at what the Hughes product is, it's continuous. To be clear, the Hughes product's bursts are 45 milliseconds long, and after 45 milliseconds, there is a guard time. Everyone agrees. They agree as to what the protocol describes. They agree that that's the length of each burst, 45 milliseconds, in the continuous mode, and they agree there is a guard time. Now, on appeal, Elbit has said to you, well, continuous means long enough. No one has ever told the jury below or this court how long is long enough, and we know that- But maybe it's not a precise thing. Well, Your Honor, actually, it is- It's a question of what a skilled artisan would understand about the 45 millisecond burst. Actually, Your Honor, it's what a skilled artisan would understand about the 45 millisecond burst, but also reading the specification because the concept of guard time, which is expressly in the IPOS protocol, this is the diagram that's at page 28 of our brief, which shows that for the stream mode, each segment is separated by a guard time. If you turn to the 073 patent at column 13, line 22, you will actually find the word guard time. So, guard time is not something that appears magically in the description of the accused product. It's in the specification, the written description, and the written description says that when you have guard time separating transmissions, they are non-continuous. Yeah, where does it say that, which seems to me- So, Your Honor, if you go to column 13, line 22, the column is talking about the first means, the first communication means, and the first transmission. And if you look at each hop has a duration of T hop, and the guard time interval between hops is T guard. This is talking about the first communication mode, which everyone agrees is the bursty mode, and it's saying the bursty mode, everyone agrees, is non-continuous. This is the random access mode? Yes, this is the random access mode. So, this is a circumstance, Your Honor, where both experts agree that the IPOS protocol is what describes the accused product. Everyone agrees the IPOS protocol describes for the stream mode transmission separated by guard time. Everyone agrees that the patent itself says when there's guard time, the transmissions are non-continuous. And what the specification does consistently is it says if you have a transmission that is separated by guard times, whatever its length, they're not continuous. They are bursty transitions. And it does that by distinguishing between the channel assignment mode and the random access mode. And at column 15, line 43 to 45, it says in the channel assignment mode, the user data is transmitted continuously in contrast with the bursty transmissions in the random access mode. My understanding of the 073 patent written description is it's talking about two different modes, a random access mode and a channel assignment mode. And as you said, for short messages, then you get to use the random access mode. But when you need higher transmission rates, then you move over to the channel assignment mode. And then you toggle back and forth between those two modes. And then the question is, is that what's happening in the accused products as well, that you have mode one for short messages and then mode two for longer messages? Your Honor, I think I would do right up until the last sentence where we had taken bursty and continuous messages and rephrased them as long and short. That is what they've asked you to do in the brief. I think you could read that brief forever and you will never find a definition of what the difference is between short and long. What you can say looking at the patent is this. It's very clear that if you have a transmission of some length followed by a guard time, that's non-continuous. The second thing we know is the second mode has to be continuous. And it contrasts with the first mode, which is bursty of whatever length separated by guard time. I agree with you that the common meaning of continuous would suggest something that just keeps going and maybe never stops. I don't know. I don't know what kind of transmission that would really be. But the spec seems to explore this in a little more detail and then tries to make a distinction between relatively short messages versus relatively longer transmissions. Your Honor, without a doubt, it says that... And then the latter one falls within the label of continuous, whatever that means. Your Honor, I think you're 100% correct in terms of what they're describing and the reasons for the two modes. The question then becomes, what did they say in the claims and how did they claim it? And they claimed it by distinguishing between the bursty mode and the continuous mode. And the continuous mode is a transmission until it's completed. And what they describe in the specification actually is multiple things, but they're reflected in the claims in three different ways, which actually are different from the two's products. The first is the fact that in our stream mode, our 45 millisecond bursts are separated by guard time. And there's absolutely no dispute about that. That is not continuous. The second problem with their infringement argument is... And just to answer, just to be clear, is there a dispute about the proposition that if there's guard time, it's not continuous? Your Honor, I don't think there can be for two reasons. One, if you've looked at the specification... You pointed to places in the spec that introduce the concept of guard time in the context of talking about mode number one. I don't think you pointed to something that said you cannot be in mode number two and have guard time. Your Honor, I can give you two facts that will answer the second part of your question. The first is this. Their expert concedes that in the stream mode, you're separated by guard time. And he concedes that that is, in his words, variable length bursts. That's an A1464. But more importantly, Albert's expert wrote a book in 2008. And the book in 2008 described a prior art system. That prior art system had a mode that sent transmissions in 45 millisecond bursts separated by guard time. And what he said about that prior art system is at A1535-36. Those are non-continuous. So, Your Honor, you have what the IPOS protocol says. You have the diagram from the IPOS protocol. You have what the in the stream mode, there's variable length bursts. And then, and Albert says he was talking in 2008 about a prior art system. He was. But he was looking at a prior art system that had short transmissions of 45 milliseconds. And he said they are non-continuous. It's all consistent. And the only thing that you have, to go back to your original question, is his conclusion that those would be continuous. But that's just a conclusion. His there being the other side's expert. His being the other side's expert. And you, I think, said you were going to make three points to Judge Chen. And I think I interrupted you after one. But have you made another two? I'll make two others on the issue of infringement. If we go to a second claim of limitation, the switching means, the court interpreted this as well to be a means plus function limitation. And it specifically said that the structure was what was disclosed at column 10 through 11. And that it had three different portions of an algorithm. One was the algorithm for switching from the first mode to the second mode. The second was switching back from the second mode to the first mode. And the third was requesting a specific data rate when you switch from the first mode to the second mode. Albert's expert addressed the first of the three. And talked about how the backlog signal is used in order to switch from the first mode to the second mode. He didn't address either of the other two. In his opening testimony. In his opening testimony. And then in his rebuttal testimony, he tried to make them, tried to make an equivalence argument. It's literally three lines. It's three lines of conclusion. And we would ask the court to look at their primary case of Dedex. Where there were mountains of claims charged. Mountains of evidence. Eight different places where the expert testified about how they were structural equivalents. And there's a reason that he didn't address it. There's a fundamental difference between the patented system and the accused system. And that is this question of switching back from the stream mode to the Aloha mode, the first mode. It's not made at the terminals. In the accused system, it's made at the hub. And so when... What is it in the claim language and perhaps by incorporation under 112.6 in the columns 10 to 11 says that the switching decision has to be made at the terminal, not at the hub? It doesn't. It's not. I wasn't saying that it has to be made at the terminal. What they're describing at column 10 to 11 is a decision that in the specifications made at the or our complaint about the non-infringement proof is this. That second part of the algorithm says you have to have predetermined and different criteria in order to switch back. The expert never identified what the criteria were for the switch back in the accused systems. Not at all. And when the panel looks at the citations, you'll find that they're talking about switching generically, but not switching back. And he never identified the manner in which in the accused system, there's a request for a specified data rate when switching from the first to second. In the accused product, when the backlog goes to zero, does it switch back to the Aloha mode? No, that's actually the key, your honor. And this is... statement by your side that suggests, well, not always, but are there times where when the backlog value flips from one to zero... Actually, your honor... It'll toggle back to the Aloha mode? Your honor... Or is it that it never will go back to the Aloha mode when the backlog goes to zero? No. You can say... I would never say never. The question is, what's the criteria that's being used? And the argument they've made to you is, it's the backlog signal that is the criteria. It's not. In fact, if I can get you the precise citation, the IPOS protocol says, and I want to make sure I've got the right place. It actually explains that... What volume of your joint appendix? It's A5252. A5252. A5252. What? 5252. 5252. What it says, your honor, is this. And this is why when Judge Tronto is asking me the difference between the hub and the terminal making the decision, the specification describes the terminal as making the decision under the criteria that are described in columns 10 to 11. In the queue system, the hub makes the decision. And what happens when there's no backlog and what the internet, the IPOS protocol says is, at that point in time, the hub looks at all the backlogs across all the terminals and then allocates in the most efficient way. So even if a terminal no longer has backlog, and this is why I didn't say never to answer your question, it may choose to keep that terminal in the screen mode. It may not. But the key here is, it's not using the predetermined criteria that's disclosed in the algorithm. And there's no equivalent, structural equivalent, of what's described in the specification. I'm into my rebuttal. My rebuttal time is gone. Mr. Rainey. Good morning, your honors. And may it please the court, Richard Rainey on behalf of ELBIT. This is a substantial evidence appeal. If I can start first with the argument on continuous data. The argument that Hughes is essentially making here is the presence of a guard interval is a matter of law, means there can be no continuous stream of data. And the problem with that is that's a waived claim construction argument. They pursued that below and didn't even appeal it out of the magistrate, and they don't appeal it to this court. So what we're left with here is a review of a jury verdict on the factual finding that this element was met. And if the court will look, and I can explain exactly how it's met here, if the court will look first at the figure that's at page 12 of our brief. Do we have in the joint appendix, when you say this was a waived claim construction argument, something that shows us that it made this request at claim construction, or it didn't make it? You're just saying it was waived because they didn't make it. No, they made a request to construe the structure to include a functional limitation that would exclude TDMA, which is basically the argument that they're making before this court. They did not appeal that. They didn't lodge objections with the district court judge, and they haven't appealed claim construction to this court. And it's probably obvious to you, but not to me, the equivalence between TDMA and the guardrail equals not continuous. Well, in a standard fixed TDA communication, which is precisely what our expert was talking about in his prior textbook, there's going to be a guard interval separating each fixed length transmission. And they argued that the patent disparages TDMA and therefore excludes any TDMA approach in the coverage of these claims. And we do cite that in our brief and to the record where that can be found. If the court would turn to page 12 of our brief, there's a figure there appendix 5017. The reason I point to the brief is we've illustrated it in color. It just helps point out the difference. And there was extensive expert testimony about this figure and the figure that appears on the next page. And I'll refer to both of those figures. Page what? Page 12 of the red brief. And I'll also be referring to the figure on page 13 of the red brief. Our expert testified extensively about this. On the left-hand side in blue are two random access mode frequencies. You can think of those as sort of a party line where all of the terminals are communicating through that terminal. And I was intrigued by Mr. Lee saying that the claim distinguishes between burst and continuous. The claim at issue actually says short, bursty, not burst, and continuous. And that is critical here. In an word game here, but let's put the words aside for a moment and focus on what's actually happening here. The short, bursty transmission of the random access mode can be easily seen by the light and dark blue boxes on the left two frequencies. The right three frequencies, and again there's ample testimony about this, are where you have the variable length transmissions in the channel access mode, or what they call the dynamic stream mode. And if you look at, for example, F4, that's the second to the far right green bar, that is a frequency that's assigned to a terminal when that terminal senses a backlog and makes a request to send data. It will plug that frequency, F4, into that terminal, and that terminal will shoot, stream, burst, whatever term you want to use, data for the length of that dark green box that you see. Again, this is all in the expert testimony here. That stream will go until the data that is sitting in the backlog of the terminal that has a backlog reported to the hub will then be assigned to that frequency, and that's where you have the light green box that follows it. This is obviously all happening very fast. And so what our expert said is, pick any one of those green stripes. They represent a variable length burst of data, or stream of data, or transmission of data, the length of which can go from what you see here all the way to the end of the frame without interruption, without there being a guard interval. And in fact, if you look at the patent's description, which they point to in their brief about what a continuous transmission is, this is at A291, column 15, 29 through 31. They rely on this in their brief as what a continuous stream means. Sorry, lines 29 through 31, column 15. The patent says, a specific frequency and a particular bandwidth are assigned. That's what I just explained. F4, the green bar, is assigned to And they rely on this in the gray brief at page 3 as a definition of continuous. That is exactly what is happening in the accused-fused system. And the sentence above that says, the channel assignment transmitter is utilized for long streams of information, i.e. message types 2 and 3. Correct. And that's, so that stream, F4, that we looked at... 45 millisecond transmission. So again, this is a... A long stream of information. To the experts involved, absolutely. I would also add this 45-second argument shows up for the first time in their reply brief, but it doesn't matter. Our experts explain that to a person of skill in the arts, 45 milliseconds, if that were the length of the stream, is quite a long stream. And it's certainly going for a period of time. And the streams, and in fact, the figure I pointed you to on page 12, a Hughes internal document, says that the dynamic stream can be used for video conference. So yes, it's exactly what is happening in this implementation. Did your expert say that that's a non-continuous transmission? I thought that's what I heard Mr. Lee say. No. What the expert was talking about was a prior art fixed length TDMA generic description in a textbook. He certainly never said this implementation wasn't continuous because he testified that it was. And again, this is substantial evidence. So the fact that he said in the prior art system TDMA, which looks more like the short bursty mode, frankly, in the blue squares on the figure on page 12, nobody's arguing that's a continuous stream of data. And in fact, another distinction here that is important is when the communication is happening over the two blue frequencies, there's no channel assigned to a terminal. So no terminal has the ability to send out data at any particular length that it wishes to send out. So I mean, that's the main distinction, frankly, between the channel access mode and the random access mode. In random access, you're forced into small bursty chunks of data, which you have no dedicated access to any frequency. You send it out, and frankly, there can be collisions of data and the like because of that. You have a bunch of terminals trying to use two pipes, a party line, Can you return to the point that you said was a waived claim construction and argument? Is there something in the spec that would convey the idea that in the channel assignment mode, you can have guard time intervals? So the channel assignment mode that was described in the patent is an FDMA. I'm sorry to dive into details. And a traditional FDMA technique is not going to have guard intervals because it's a frequency hopping, not a time hopping sequence. So it talks about guard rails, not guard intervals, because of the nature of that type of communication technique. And the argument they made below was we were limited to the preferred embodiment described in the patent. And the magistrate judge rejected that. The preferred embodiment of the Yes, that is correct. That's what the magistrate said. You were not limited to that. That is correct. And that those materials are referenced in our brief and cited. They're in the joint appendix for the court. So if I can turn to the switching means argument that Mr. Lee made as well. It seemed like the testimony of your expert was really focused on the transition from aloha mode to dynamic stream mode and didn't really quite get to the other pieces of the algorithm. So the expert on multiple occasions said the entire corresponding structure was in the accused device. Second, the issue that he was confronting in that testimony was the argument that Hughes had made below that it was the hub and not the terminal that was making the switching decision. So that was the focus of the testimony. It is true it was in the context of the forward switch. But the logic, frankly, and the inferences to be drawn from that apply equally well to the reverse switch. If you look at the corresponding structure, the algorithm, if you will, that's in the patent, it is not terribly complex. You start in the random access mode. The terminal senses a backlog. It tells the hub, I have a backlog. The hub then obeys that and switches the terminal over to channel access mode or, in their case, dynamic stream. And then when the backlog goes to zero, the terminal tells the hub, my backlog is now zero, and the hub will switch to dynamic stream. If you think about the cost and the inefficiencies of keeping terminals in the channel access mode or in the dedicated mode, we cite that evidence in the record extensively. There's tremendous cost to the satellite provider. There's tremendous inefficiencies of keeping a terminal plugged into one of these dedicated frequencies for any longer than it absolutely has to be plugged in. And so, logically, if the terminal is going to switch from random access mode to channel access mode when it senses a backlog, that's putting it into a situation where that terminal is now eating up bandwidth in the system and costing the satellite provider money. So the system, a reasonable inference here is the system, when it senses, when it's told by the backlog, will switch it back as quickly as it possibly can to reduce that cost. So all of the testimony that you saw on the front side applies equally well to the back side. And in fact, Mr. Lee cite, go ahead. I know there's a, this is a substantial evidence to review, but isn't there some evidence in the record that the accused device doesn't necessarily switch back to Aloha mode when the backlog goes to zero? So the only evidence they've cited is in their reply brief, and it's the IPOS standard that Mr. Lee talked about in his argument. There's no expert testimony about that because it wasn't discussed by their expert. Now the IPOS is in the record, but what the IPOS says is not that it doesn't switch back. The first sentence of that, this was what you all looked at at A5252. The first sentence of that says, if a terminal's backlog goes to zero, the hub does not immediately stop allocating bandwidth to the terminal. That's fine. There's nothing in this corresponding structure that requires an immediate switch, and nothing in the world happens immediately. So yes, there may be some slight delay. There may be some logic that the hub has to process when it gets that request from the terminal to switch me back, but there's nothing requiring an immediate switch. So there's nothing inconsistent with that. In fact, I would argue that sentence entirely supports what I'm saying. What about the next sentence after that? So the next sentence is talking about an optional feature. If you read it, it says, depending on configuration parameters, the hub may assign bursts. Now what that's talking about is a delay timer, a very brief delay timer that the hub will put in to protect itself from a terminal that changes its mind. So imagine I have a terminal that records a backlog. I stream my backlog out. I then send to the hub an announcement. My backlog is now zero. The hub will say, okay, I'm going to start to switch you back, but I'm going to wait, let's say, three or four clock cycles to see if suddenly some data comes into the terminal, which then will cause the terminal to switch its backlog bit from zero to one again and tell me to then assign a channel back to you. I'm better off keeping you in the channel assignment mode and waiting for you to tell me whether you're going to change your mind than switching you and then having to switch you right back. That's not disobeying the terminal in any way. I was just struck by how it'd be nice if it wasn't just you and Mr. Lee telling me all of this about A5252. Well, that's, I mean, frankly, Judge, under the substantial evidence review, that's exactly right. The testimony in this case, the reasonable inferences which are required to be drawn in our favor from the testimony you do have are that it would be illogical for the hub to keep a terminal in channel access mode for any longer than it absolutely has to. Furthermore, the testimony is that the hub doesn't know what's going on at the terminal and has to rely on the terminal to tell it what's going on, and there is direct testimony. I think Mr. Lee made some reference, and again, I don't remember what he cited for this, about, as I heard it, some idea that the hub under this 5252 looks around to see what other backlogs other users have, and perhaps if there's not a lot of demand from the others, it will continue to maintain this channel for the particular one. So I've read this. I don't know where Mr. Lee is getting that from, but that certainly is not evidence of record. What is of record is the text here, and I will say that at the very least... Was there testimony? No, no testimony, but this was not introduced at all by Hughes or discussed. I think the point here is simple. Our expert looked at the source code, looked at their documents, and the testimony is the logic, the reasonable inferences here are this is exactly how a backlog-based assignment system works. When you have a backlog, the terminal tells the hub and the hub obeys the terminal. When the backlog disappears, the hub is going to take that terminal off the channel at the inefficient, expensive channel access mode, and that's what the evidence here supports under any reasonable inference. And even frankly, if Mr. Lee could point to reasonable inferences in his direction, the Supreme Court and this Court have made it clear that is not... We are entitled to all inferences, even when there are contrary inferences the other direction. Sorry, last question. I know we got to go. Is margarite toys control? Absolutely not, Your Honor. I don't know how I could argue it better than this Court has stated and held in Ornstein that margarite was overruled by Swint on the very issue that they seek to invoke jurisdiction of this Court on, and that is there is no basis for pendant appellate jurisdiction in the facts of this case. And frankly, the arguments they made for pendant appellate jurisdiction were squarely rejected in Ornstein. And there has not to date been a quantification of attorney's fees. Was that postponed until this appeal is done? So there has not been a quantification. I don't know why, so I don't want to represent why, but there has not been a quantification. If the Court has no further questions, we would respectfully request the Court affirm and dismiss the appeal on the unquantified fee award for lack of jurisdiction. Thank you very much, Mr. Rainey. Mr. Leith, you have three minutes. Yes, Your Honor, I'll be brief. First, on the question of whether there's something other than Mr. Rainey and I talking back and forth on this question of switching back at A2122 and A2124 to A2125, you'll find the testimony addressing the question of switching back at the fact that it's made at the hub and not the terminal. You take that together with the IPOS protocol, which their expert concedes is how the accused product works, and it's just a simple indisputed fact. Second point, the claim construction argument made concerning TDMA has nothing to do with any of the issues that are before you today. It was a different argument trying to limit the scope of the claim to what was disclosed in the embodiments. It's not the issue that's before you. We don't challenge the claim construction. We make a very simple argument. The claim construction says continuous. The claim says continuous. The experts agree that the IPS protocol is the governing document, and it is correct. It says for the stream mode, there is guard time that separates transmissions of 45 milliseconds. The patent says that when you have guard time, it's not continuous. That's the end of the story. It doesn't matter that it's substantial evidence because it's a simple set of undisputed facts. On the switching means, the thing that's missing from Mr. Rainey's discussion is it's their burden to show that they're using the structure or the equivalent structure, and the structure is at column 11, lines 21 to lines 25, and it's very specific, and you will search the record in vain for any testimony that this algorithm or this portion of the algorithm is using the accused products. You will search the record in vain for the description that Mr. Rainey provided you about switching back, and the only thing that there is on equivalence is three sentences on redirect where he concludes without any explanation at all that they are equivalent. The last point is this. On this question that was raised by Judge Toronto at the outset, and Judge Chen, you raised it, is it short versus long, or is it short burst versus continuous? Having briefed this case now, having argued to your honors, having had it tried below, Albert has never been able to tell you how long is long enough. Who's the person to say that the diagram that Mr. Rainey started with, the three on the right are long enough, but the two on the left are not long enough? There's not a thing that would answer that question, and the reason there's no answer to that question of how long is long enough is at A, 1535 to 36, where their expert said this, quote, but there's a guard time between the burst, correct? Answer, yes, sir. Question, and that's what you meant by non-continuous, correct? That's correct. That's the answer. It's the infringement question, and it means there's no infringement. Thank you. Thank you, Mr. Lee. Thanks to both guys. The honorable court is adjourned until tomorrow morning at 10 a.m.